[Cite as *State v. Lloyd*, 2021-Ohio-2420.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | | |
|---|---|---|---|
| STATE OF OHIO, | : | | JUDGES: |
| | : | | Hon. Craig R. Baldwin, P.J. |
| Plaintiff - Appellee | : | | Hon. William B. Hoffman, J. |
| | : | | Hon. John W. Wise, J. |
| -vs- | : | | |
| | : | | |
| MARIAH LLOYD, | : | | Case No. 2020 CA 00074 |
| | : | | |
| Defendant - Appellant | : | | O P I N I O N |


CHARACTER OF PROCEEDING:              Appeal from the Licking County
                                                          Municipal Court, Case
                                                          No.19CRB00841


JUDGMENT:                                         Affirmed


DATE OF JUDGMENT:                           July 14, 2021


APPEARANCES:

For Plaintiff-Appellee                             For Defendant-Appellant

AMY S. DAVISON                                 TODD W. BARSTOW
40 West Main Street                              261 West Johnstown Road, Suite 204
Newark, Ohio 43055                              Columbus, Ohio 43230

*Baldwin, J.*

{¶1} Appellant, Mariah Lloyd, appeals her conviction for a violation of Prohibitions Concerning Companion Animals, Section 618.051(c)(2) of the Codified Ordinances of the City of Newark, a misdemeanor of the second degree, arising from her treatment and the death of a dog in her care. Appellee is the State of Ohio.

**STATEMENT OF FACTS AND THE CASE**

{¶2} At approximately 9:00 a.m. on May 26, 2020, Charles Cooper was wakened by a barking dog in his neighbor's yard. Cooper was living in a tent in his sister's back yard, so the barking was very clear and it continued as the day became warmer and no one tended to the animal. Both Cooper and his sister noticed that the barking changed to a yipping sound and then more of a gasp. They checked on the dog and found it in distress, biting at its restraint and gasping. Charles Cooper's sister, Samantha, recorded a video of the dog after they alerted the Newark Police Department of an animal in distress.

{¶3} The police responded to the call, but not before the dog died. Officers Harris and Scholl found the animal unresponsive, still attached to a pole, in Lloyd's back yard. The officers contacted Newark Animal Control, took statements from the Coopers and photographed the scene. After three attempts to reach someone in the Lloyd home, two individuals responded, but apparently had no relevant information for the officers.

{¶4} Toby Wills, officer for Newark Animal Control, responded to the call and removed the dog's body from the yard and transported it to the office of Jodi Houser, DVM to determine the cause of death. Dr. Houser completed an examination of the dog and

concluded that the dog died as a result of heat stroke finding that "all physical exam findings" were "consistent with severe dehydration and death." (Plaintiff's Exhibit 7).

**{¶5}**    Officer Wills visited Lloyd on May 29, 2020 and obtained a written statement from her regarding her dog's death.  She stated: "Tuesday the 26 I woke up fed my dog and I put him outside because he usually tears up the house if nobody is up and I asked my stepdad to make sure he checks on him and give him food and water. Came home to find out he wrapped himself around the pole and hung himself." (Plaintiff's Exhibit 9).

**{¶6}**    On June 2, 2020 Lloyd was charged with a violation of Section 618.051 of the Codified Ordinances of the City of Newark, captioned Prohibitions Concerning Companion Animals.  The relevant portions of this Code Section states:

(c) No person who confines or who is the custodian or caretaker of a companion animal shall negligently do any of the following:

* *

(2) Deprive the companion animal of necessary sustenance, confine the companion animal without supplying it during the confinement with sufficient quantities of good, wholesome food and water, or impound or confine the companion animal without affording it, during the impoundment or confinement, with access to shelter from heat, cold, wind, rain, snow, or excess direct sunlight, if it can reasonably be expected that the companion animal would become sick or suffer in any other way as a result of or due to the deprivation, confinement, or impoundment or confinement in any of those specified manners.

{¶7} Lloyd's case was presented to a jury in the Licking County Municipal Court on October 1, 2020. Charles Cooper opened the state's case by testifying about the barking dog in the neighbor's yard that woke him at about 9:00 a.m. on the morning of May 26, 2020. He described the weather as "hot" and "nasty" and noticed that the barking continued throughout the morning and into the afternoon. Cooper did not see anyone tend to the dog.

{¶8} The sound of the barking changed to a gasp or yap and became quieter, so Cooper investigated and noticed the dog tangled in a leash tied to a pole. Cooper did not see any food or water for the dog and decided to call the police because "Something was wrong with the dog and I didn't feel safe going over and helping it." (Transcript p. 75, Lines 9-11).

{¶9} Samantha Cooper was awakened by the barking dog as well, at around 9:00 a.m. The barking was loud and repetitive, but she did not pay much attention to the barking until it changed to a yap or rasping sound. She recalled that when the sound changed, her brother decided to call the police and she decided to check on the dog. She found the animal "tied up and laying against the fence and in distress." (Transcript p. 89, Lines 9-10). She did not see any shelter or water for the dog.

{¶10} Samantha Cooper decided to use her phone to better see the dog because she could not see it very well without entering the neighbor's yard. She created a video recording of the dog, and that video was played for the jury. Cooper recalled seeing the dog lying on its side, yapping with its tongue hanging out. The video showed the dog in its final moments of life and also confirmed that it had no water or shelter. Samantha Cooper did not see anyone tend to the dog at any time.

{¶11} Officer Harris of the Newark Police Department arrived at Lloyd's home at approximately 1:35 p.m. but the dog had died before the officer arrived. Officer Harris and another Newark Police Officer, Officer Scholl, photographed the scene showing the dog tied to a pole on a short leash as well as the absence of shelter, food or water. After trying to contact someone in the house at the front door and the rear, they made contact with two individuals in the home, but the record contains no further information regarding them.

{¶12} Toby Wills, Newark Animal Control Officer, was called to the scene by the Newark Police Department. Mr. Wills confirmed that the day was very warm when he arrived and that there was no shelter or water available for the dog. He saw two people on the back porch of the home, but both denied ownership of the dog. As Wills placed the animal in his vehicle he noticed that it had no collar and that leash was fastened in a loop around its neck. He transported the animal in his air-conditioned vehicle to Newark Animal Hospital for a necropsy.

{¶13} Despite spending ten minutes in an air-conditioned vehicle before arriving at Newark Animal Hospital, Jodi Houser, DVM found that the dog's internal temperature extremely high. The dog's temperature exceeded the 109.9-degree limit of her equipment, and the animal's internal organs were warm enough to prevent her from handling them comfortably during the internal examination. Despite the unusually high temperature, she concluded that the dog had been in good health prior to its death. As to the cause of death, she found the dog's eyes sunken, and noticed petechiae and ecchymosis (types of bleeding beneath the skin) in different areas of the body that, considered in conjunction with the animal's temperature, led her to conclude that the

animal had died as a result of heat stroke caused by lack of water and shelter. She did confirm that the dog had not strangled itself and that it had not ingested anything fatal. In fact, the doctor confirmed that the animal's digestive system was empty, indicating that it had not been fed for twenty-four hours.

{¶14} The state moved to admit as exhibits the video taken by Samantha Cooper, the photographs of the scene taken by the police officers, Lloyd's written statement, and the report of Dr. Houser with accompanying photographs.

{¶15} Lloyd testified on her own behalf, claiming that she fed and watered her dog, Chico, before her father took her to work at approximately 7:30 a.m. She asked her father to check on Chico when he returned home and before he went to work at 9:00 a.m. She expected her father to give Chico water and feed him again, even though she claimed to have fed him at 7:30 a.m.

{¶16} In the statement she gave to Animal Control Officer Wills, Lloyd had claimed that Chico was put outside because he "tears up the house" but during trial she explained that he was put outside while others in the house were cleaning the carpets. Her siblings were to bring the dog in after they finished the carpets, and Lloyd recalls waking them to tell them to bring Chico in the house. She had a phone and the opportunity to call from work, but she did not call to ensure that her siblings had remembered to care for Chico.

{¶17} She stated she did not put Chico out frequently while she worked and called him an "inside dog." She described Chico as a family pet that she cared for who preferred to be indoors in an air-conditioned space and not outside in the sun. She put him outside on May 26 by fastening part of an old collar to his leash. She acknowledged that Chico had no shelter and that she was responsible for providing shelter.

**{¶18}** Lloyd's father, Russell Speicher, contradicted Lloyd's assertion that he fed Chico after he drove her to work. He explained that Chico would eat when he first got up in the morning, so Speicher would not feed him later.

**{¶19}** After taking Lloyd to work, Speicher returned to the house and found Chico's water-bowl had been overturned.  He filled it and left for work after 8:30 a.m. as was his usual practice. He confirmed that his family, including Lloyd, knew that he would leave for work in the morning. He also confirmed that his wife left the house around 8:00 a.m. as well.

**{¶20}** Speicher admitted that Chico was often put outside when the family was away and that they did not have any shelter for Chico, contradicting Lloyd's statement that Chico was not put outside frequently. He confirmed that Chico was outside on May 26th so the carpets could be cleaned, after which Chico was to be returned to the house.  Speicher's other children were expected to clean the carpets and retrieve Chico, but the children were still in their rooms when he left for work and they did not testify.

**{¶21}** Lloyd rested her case and the matter was presented to the jury. The trial court read the instructions to the jury and, at the conclusion, the trial court asked if "either counsel [had] any objections or additions to the jury instructions or the verdict forms" and neither party objected or requested additions.  (Trial Transcript, p. 253, lines 20-21 to p. 254, lines 1-3).

**{¶22}** The jury returned a verdict of guilty and Lloyd was sentenced to ninety days in jail, with sixty days suspended and two years on probation during which she must maintain full time employment and not "keep, own, harbor, or otherwise possess or be responsible for any domesticated animals." (Transcript, p. 260, lines 10-11). The trial

court imposed a fine of $150.00, court costs and ordered that she reimburse the Newark Police Department $75.00 for the cremation of the dog.

{¶23} Lloyd filed a timely appeal and submitted three assignments of error:

{¶24} "I. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HER GUILTY OF PROHIBITIONS CONCERNING COMPANION ANIMALS AS THAT VERDICT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WAS ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE." (T. 186-224; R. Judgment Entry 10/1/20).

{¶25} "II. THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO FULLY INSTRUCT THE JURY ON THE MENTAL STATE OF NEGLIGENCE." (T. 225-227; 246; 249-250).

{¶26} "III. APPELLANT'S TRIAL COUNSEL WAS INEFFECTIVE, THEREBY DENYING HER THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS." (T. 225-227; 246; 249-250).

## STANDARD OF REVIEW

{¶27} Lloyd's first assignment of error alleges the evidence is insufficient to support the conviction and the conviction is against the manifest weight of the evidence. The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins,* 78 Ohio St.3d 380, 1997–Ohio–52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a

challenge to the sufficiency of the evidence is set forth in *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held as follows: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶28} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins, supra,* at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶29} We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 237 N.E.2d 212 (1967). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the page." *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 1997–Ohio–260, 674 N.E.2d 1159.

{¶30} In her second assignment of error, Lloyd alleges a defect in the jury instructions.  Lloyd failed to object to the jury instructions so we are limited to reviewing the record for plain error. Crim. R. 52(B) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." By its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial. First, there must be an error, i.e., a deviation from a legal rule. *State v. Hill,* 92 Ohio St.3d 191, 200, 749 N.E.2d 274, 283 (2001) (observing that the "first condition to be met in noticing plain error is that there must be error"), citing *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), (interpreting Crim.R. 52[B]'s identical federal counterpart, Fed.R.Crim.P. 52[b]). Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. *State v. Sanders*, 92 Ohio St.3d 245, 257, 750 N.E.2d 90, 111, (2001), citing *State v. Keith,* 79 Ohio St.3d 514, 518, 684 N.E.2d 47 (1997); see, also, *Olano, supra* at 734 (a plain error under Fed.R. Crim.P. 52[b] is " 'clear' or, equivalently, 'obvious' " under current law). Third, the error must have affected "substantial rights." The Supreme Court has interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial. See, *e.g., Hill, supra* at 205; *State v. Moreland,* 50 Ohio St.3d 58, 62, 552 N.E.2d 894(1990); *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804(1978), paragraph two of the syllabus.

{¶31}  Even if a forfeited error satisfies these three prongs, Crim.R. 52(B) does not demand an appellate court correct it. Crim.R. 52(B) states only that a reviewing court "may" notice plain forfeited errors; a court is not obliged to correct them. The Supreme

Court of Ohio has acknowledged the discretionary aspect of Crim.R. 52(B) by admonishing courts to notice plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long, supra*, paragraph three of the syllabus; see, also, *Olano, supra*. at 736 (suggesting that appellate courts correct a plain error "if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings," quoting *United States v. Atkinson* 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936)).

**{¶32}** In her third assignment of error, Lloyd contends that her trial counsel's failure to request jury instructions that included definitions of the terms "substantial," "due care," and "risk" constituted ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate: (1) deficient performance by counsel, i.e., that counsel's performance fell below an objective standard of reasonable representation, and (2) that counsel's errors prejudiced the defendant, i.e., a reasonable probability that but for counsel's errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus. "Reasonable probability" is "probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

## ANALYSIS

### I. WEIGHT AND SUFFICIENCY OF EVIDENCE

**{¶33}** Lloyd was charged with a violation of Section 618.051(c)(2) of the Codified Ordinances of the City of Newark which states:

(c) No person who confines or who is the custodian or caretaker of a companion animal shall negligently do any of the following:

\* \*

(2) Deprive the companion animal of necessary sustenance, confine the companion animal without supplying it during the confinement with sufficient quantities of good, wholesome food and water, or impound or confine the companion animal without affording it, during the impoundment or confinement, with access to shelter from heat, cold, wind, rain, snow, or excess direct sunlight, if it can reasonably be expected that the companion animal would become sick or suffer in any other way as a result of or due to the deprivation, confinement, or impoundment or confinement in any of those specified manners.

{¶34} Lloyd conceded that Chico was her pet, clearly a companion animal and that she restrained him in the back yard of her home without shelter from the elements on May 26, 2020. The testimony supports a conclusion that she did not provide "sufficient quantities" of food or water and that the animal was exposed to heat and excess direct sunlight. Lloyd's testimony that she expected the dog to be retrieved from the yard early in the morning and the examination of Dr. Houser support a conclusion that "it could be reasonably suspected that [Chico] would become sick or suffer" and died as a result of a substantial lapse of due care by Lloyd consisting of her failure to ensure that Chico was given adequate shelter and water on a very hot day.

{¶35} Lloyd's attempt to deflect blame for the death of Chico from herself to her father or siblings was not accepted by the jury. Lloyd claimed that she expected her father

to provide food and water to Chico and that her siblings would bring Chico in the house after they had cleaned the carpets, but the jury refused to accept this defense. We defer to the trier of fact as to the weight to be given the evidence and the credibility of the witnesses. *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), at paragraph one of the syllabus. The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witnesses' credibility. As we found in *Gerrick v. Anheuser Busch Co.*, 5th Dist. Stark No. 2000CA00140, 2000 WL 1838903, *2 (Dec. 11, 2000), "[a] jury is free to accept or reject any or all of the testimony of any witness, including testimony of an expert witness. *Weidner v. Blazic* (1994), 98 Ohio App.3d 321, 335. Further, even when the evidence is undisputed, the jury possesses the inherent right to reject the evidence presented. *Krauss v. Kilgore* (July 27, 1998), Butler App. No. CA-97-05-099, unreported, at 15, citing *Lantham v. Wilson* (Aug. 12, 1991), Madison App. No. CA90-11-024, unreported." The verdict in this case is consistent with a jury decision to discount Lloyd's and Speicher's testimony, and accept the testimony of the state's witnesses.

{¶36} Recognizing the fact-finder's discretion to accept or reject evidence and, viewing the evidence in the light most favorable to state, we conclude that a reasonable person could have found beyond a reasonable doubt that Lloyd was guilty of a violation of Section 618.051(c)(2).

{¶37} Lloyd also contends that the conviction was against the manifest weight of the evidence. After reviewing the record and considering our resolution of the claim regarding insufficient evidence, we cannot find that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and

a new trial ordered." *State v. Woody*, 5th Dist. Stark No. 2019CA00175, 2021-Ohio-860, ¶ 40.

**{¶38}** Lloyd's first assignment of error is denied.

## II. INCOMPLETE JURY INSTRUCTIONS

**{¶39}** In her second assignment of error, Lloyd contends the trial court failed to "fully instruct the jury on the mental state of negligence" by not reading the definitions of "due care," "substantial," and "risk". Lloyd contends that because these definitions appear within Ohio Jury Instructions, they must be included in the jury instructions used by the trial court. She contends this error created a manifest injustice, and it deprived her the right to a fair trial because it deprived the jury the ability to correctly consider all the relevant and proper evidence admitted at her trial and that failure to correct the error could seriously impair the fairness, integrity, or public reputation of judicial proceedings.

**{¶40}** Lloyd was charged with a violation of Section 618.051(c)(2) of the Codified Ordinances of the City of Newark which has a mens rea of negligence. The trial court defined "negligently" within the jury instructions:

A person acts negligently when because of a substantial lapse of due care, the person fails to perceive or avoid a risk that the person's conduct may cause a certain result or may be of a certain nature. A person is negligent with respect to circumstances when, because of a substantial lapse from due care, the person fails to perceive or avoid a risk that such circumstances exist.

**{¶41}** This definition is found in Section 606.02(d) of the Codified Ordinances of the City of Newark. Ohio Jury Instructions contain an identical provision and definitions

of "due care," "substantial," and "risk," but these definitions were not used by the trial court in the instructions and neither party objected to their absence or insisted that they be included:

> 2. DUE CARE (NEGLIGENCE). Due care is that amount of care that a reasonably careful person would use under the same or similar circumstances.

> 3. SUBSTANTIAL. The lapse or failure to use due care must be substantial. Substantial is another word for material, which means being of real importance or great consequence.

> 4. RISK. "Risk" means a significant possibility, as contrasted with a remote possibility, that (a certain result may occur) (certain circumstances may exist).

**{¶42}** Lloyd argues the omission of these definitions is error warranting a reversal of the conviction, but she concedes that she did not object to the jury instructions and waived all but plain error. (Crim.R. 30(A)). *State v. Williford (*1990), 49 Ohio St.3d 247, 251, 551 N.E.2d 1279, 1283 as quoted in *State v. Keenan,* 81 Ohio St.3d 133, 151, 689 N.E.2d 929, 946 (1998). Lloyd acknowledges our review is restricted to a determination of whether the trial court committed plain error.

**{¶43}** We apply the doctrine of plain error cautiously and only under exceptional circumstances to prevent a manifest miscarriage of justice. *State* v. *Rohaley*, 5th Dist. Stark No. 1998CA00092, 1999 WL 4505, *4 In that regard, "[T]he test for plain error is stringent." *State v. Ellison,* 4th Dist. No. 16CA16, 2017-Ohio-284, 81 N.E.3d 853, ¶ 27. "To prevail under this standard, the defendant must establish that an error occurred, it

was obvious, and it affected his or her substantial rights." *State v. Spaulding,* 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 64. An error affects substantial rights only if it changes the outcome of the trial. *Id.*

**{¶44}** Lloyd has the burden to establish the existence of plain error, unlike the situation in a claim of harmless error, where the burden lies with the state. Lloyd must establish that the outcome of the trial would clearly have been different but for the trial court's allegedly improper actions. *Moreland, supra,* at 63 as quoted in *State v. Waddell,* 75 Ohio St.3d 163, 166, 661 N.E.2d 1043, 1046 (1996) *See Also State v. Cooperrider,* 4 Ohio St.3d 226, 227, 448 N.E.2d 452, 453 (1983) ( * * * an erroneous jury instruction "does not constitute a plain error or defect under Crim.R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise. *State v. Long (*1978), 53 Ohio St.2d 91, 97, 372 N.E.2d 804.")

**{¶45}** Lloyd does not explain why the outcome of the trial would have been different if the relevant definitions would had been given. She argues that "In the instant case, the complete definition of negligence was necessary since, without it, the trial jury would have been prevented from carefully considering all the elements of the charged offense." (Appellant's Brief, p. 5), but the record shows that the full definition of the term "negligently" was included in the instructions and that only the supplemental definitions were omitted. Further, Lloyd does not argue or contend that the outcome of the trial would clearly have been different but for the trial court's allegedly improper actions, but only that the jury "could well have acquitted her based on the complete instructions" and that the instructions "may have induced an erroneous verdict," relying upon *Parma Hts. v. Jaros,* 69 Ohio App.3d 623, 591 N.E.2d 726, 730 (8th Dist.1990). Lloyd uses the wrong

standard to measure the impact of the alleged error and the precedent she relies upon is inapposite. Lloyd must demonstrate that the outcome **clearly** would have been different, not that it "could have" or "may have" been different. And the *Parma Hts* court was not reviewing a decision for plain error.  Further, the complete citation makes clear that the *Parma Hts court* focused upon the need for proof of a prejudicial impact. "Thus, this court will not reverse unless an instruction is so prejudicial that it may induce an erroneous verdict." *Id.* at 630. Lloyd's failure to show that the prejudicial impact was so great that the outcome the trial would clearly have been different is a fatal flaw in her argument.

{¶46}  Appellant also cites to several cases in the conclusion of her argument in the second assignment of error, but those cases focus upon the obligation to provide instructions regarding "essential elements" of the offense.  Lloyd does not describe missing essential elements in the instructions in this case but only "helpful definitions" (Appellant's Brief p. 4) of words that are not so uncommon that definitions are necessary for the jurors to properly understand the law.

{¶47} We have reviewed the questioned instruction in its entirety and in the context of the instructions as a whole, and find the trial court did not commit plain error in providing the stated instruction without the definitions of "due care," "risk," and "substantial." These omissions, even if considered an error, did not seriously affect the fairness, integrity or public reputation of judicial proceedings, did not have an effect on the outcome of the trial and was not a manifest miscarriage of justice.

{¶48}  Lloyd's second assignment of error is denied.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

**{¶49}** In her third assignment of error, Lloyd complains that she received ineffective assistance of counsel because her trial counsel did not object to the omission of the definitions of the terms "due care," "risk," or "substantial."

In order to prevail on an ineffective-assistance-of-counsel claim, a defendant must prove that counsel's performance was deficient and that the defendant was prejudiced by counsel's deficient performance. *Bradley*, 42 Ohio St.3d at 141-142, 538 N.E.2d 373; *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Thus, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. See *Bradley* at paragraphs two and three of the syllabus. 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' *Id.* at 142, 538 N.E.2d 373, quoting *Strickland* at 694, 104 S.Ct. 2052.

*State v. Davis*, 159 Ohio St.3d 31, 2020-Ohio-309, 146 N.E.3d 560.

**{¶50}** Even if we would assume that counsel's performance fell below an objective standard of reasonable representation, we cannot find there was a reasonable probability that, but for those errors, the result of the trial would be different. The words in question are not so unusual as to be incomprehensible, vague or ambiguous such that a jury would not comprehend their meaning without the "helpful definitions" Lloyd claims were vital. Lloyd suggests that "[t]hose terms have meanings that are not necessarily common" (Appellant's Brief, p.7) but does not include any alternative meanings or definitions that

may have affected the jury's review.   Lloyd does not offer any explanation of the impact of the omitted definitions and seems to imply that the fact that they were not included is sufficient to establish ineffective assistance, but "[t]he instructions found in Ohio Jury Instructions are not mandatory." *State v. Gilkey,* 5th Dist. Licking No. 18-CA-103, 2019-Ohio-4417, ¶¶ 30. Lloyd has failed to offer a persuasive argument that the addition of the definitions would lead to a reasonable probability that the results of the trial would be different.

**{¶51}** Further, the state provided substantial evidence to support the conclusion that Lloyd restrained Chico in her yard without providing any shelter from the sun or heat, giving little or no consideration for the animal's need for shelter and water.  The jury was not obligated to accept her defense that she relied upon her family to care for Chico, and, considering the conflicting testimony of her father and her failure to take simple steps to ensure that her family followed her wishes, we cannot find that the jury's apparent decision to disregard her testimony was unwarranted.

**{¶52}** We found that the omission of the definitions from the jury instructions did not constitute plain error for lack of evidence of a prejudicial impact on the outcome of the trial, so, because the same deferential standard applies to ineffective assistance of counsel claims, we find that the failure to object to their omission does not comprise ineffective assistance of counsel. *State v. Remillard,* 5th Dist. Knox No. 18CA16, 2019-Ohio-3545, ¶ 71appeal not allowed,157 Ohio St.3d 1524, 2019-Ohio-5327, 137 N.E.3d 107, and cert. denied,141 S.Ct. 305, 208 L.Ed.2d 56.

**{¶53}** Lloyd's third assignment of error is denied and the decision of the Licking County Municipal Court is affirmed.

By: Baldwin, P.J.

Hoffman, J. and

Wise, John, J. concur.