[Cite as *In re C.W.*, 2026-Ohio-2056.]

IN THE OHIO COURT OF APPEALS
FIFTH APPELLATE DISTRICT
FAIRFIELD COUNTY, OHIO

| IN THE MATTER OF C.W. | Case No. 2026 CA 00002 |
| | Opinion And Judgment Entry |
| | Appeal from the Fairfield County Court of Common Pleas, Juvenile Division, Case No. 2024 AB 91 |
| | Judgment:  Affirmed |
| | Date of Judgment Entry: June 1, 2026 |

**BEFORE:** William B. Hoffman; Robert G. Montgomery; David M. Gormley, Judges

**APPEARANCES:** R. KYLE WITT, Fairfield County Prosecuting Attorney by JUSTIN BENEDICT, for Plaintiff-Appellee; JAMES S. SWEENEY, for Mother, Defendant-Appellant.

*Montgomery, J.*

{¶1}  Mother appeals from the judgment of the Fairfield County Court of Common Pleas, Juvenile Division, granting permanent custody of her two children – CW and MEW – to Fairfield County Children's Protective Services ("FCCPS").  For the reasons below, we AFFIRM.

**STATEMENT OF THE CASE**

{¶2}  This matter involves two children, CW, born on August 14, 2019, and MEW, who was born on July 21, 2024.  MW is the mother ("Mother") of both children and SW

is the father of the children.[1]  On July 23, 2024, CW was placed in the temporary shelter custody of Fairfield County Protective Services (the "Agency"). On August 28, 2024, the court found CW to be a dependent minor and placed in the Agency's temporary custody. On September 3, 2024, MEW was placed in the temporary shelter custody and on November 26, 2024, she was found to be a dependent minor and placed in the Agency's temporary custody.  Both children were placed together in the same foster family and have remained there throughout these proceedings.

{¶3}  On August 29, 2025, the Agency filed motions for permanent custody ("PC") regarding both children.  On December 8, 2025, the oral hearing on said motions took place before a Magistrate of the Court.  On December 19, 2025, the Magistrate issued a Decision with Notice, granting the Agency's Motion for PC of CW and MEW.  No objections were filed.  The trial court adopted the Magistrate's Decision.  On January 14, 2026, Mother filed the instant appeal.

## RELEVANT BACKGROUND FACTS

{¶4}  The Agency originally got involved with CW and MEW (sometimes referred to as the "children") after reports that Mother was using methamphetamines and marijuana and that CW had access to drug needles in the home.  Additional Agency concerns included: (a) lack of food in the home, (b) poor living conditions (there were no utilities in the home because Mother and Father were in fact homeless and "squatting"), and (c) Mother's cognitive abilities to properly parent and care for the children.  The Agency prepared a case plan addressing its concerns and setting specific objectives with the goal of reunification.  Mother was required to engage in mental health and substance

---

[1] Father has not seen the children since the inception of the matter and **is not** part of this appeal.

use disorder assessments and follow all recommendations from providers. She was also required to attend a parenting education course, to ensure stable and appropriate housing for her and the children, establish stable income, screen randomly and negatively for illicit substances, and establish parenting time with the children.

{¶5} At the PC hearing, Mother's caseworker testified that Mother engaged in and completed many of the case plan objectives. After a two-month delay due to being homeless, Mother completed the mental health assessment, completed all counseling sessions, and voluntarily continued after it was no longer required. The caseworker testified that the program was going to discharge Mother, but she advocated for herself to continue sessions. Mother also completed the required substance use disorder assessment, which also recommended counseling. Mother met all treatment goals and was ultimately discharged. The caseworker testified Mother had all negative drug screens since July 2024.

{¶6} However, during the PC hearing, the caseworker received an anonymous tip that Mother had used drugs recently and would test positive if the Agency screened her. The court allowed the caseworker to test Mother, and the test was positive for methamphetamines, marijuana, and amphetamines. Mother took prescription medication for ADHD, which explained amphetamines in her system. Regarding the additional drugs present, Mother told the caseworker she did in fact use marijuana prior to the hearing, and the marijuana must have been laced with methamphetamines, without her knowledge. The caseworker stated that Mother gave this same reason on prior occasions when she tested positive for methamphetamines.

{¶7} Regarding parenting education, Mother enlisted the help of Early Head Start and was consistent in her participation and visits. Despite her consistent

attendance, there were ongoing concerns regarding her ability to parent. The parent support services coordinator, Charles Trolley, who participated in the parenting time with Mother, testified regarding Mother's parenting skills. Mr. Trolley stated that Mother had trouble redirecting and/or correcting CW when he acted inappropriately. Mr. Trolley testified that Mother had a difficult time handling both children at the same time and despite guidance by the program, Mother did not retain the information given to her. At one visit, Mother gave MW (only one year old at the time) an entire sandwich instead of cutting it into small pieces. Mother often brought inappropriate food for the children, such as day-old McDonalds or items that should have been refrigerated but were not. Mr. Trolley further testified that Mother needed constant reminders to keep unsafe things out of her children's reach, and, on more than one occasion, Mother left MW in her stroller while Mother walked away to tend to something else. Mother would often bring other individuals to the visits and those individuals would become the primary caregiver.

**{¶8}** At the beginning of these cases, Mother was homeless, until such time as she moved in with her boyfriend in October 2024. Mother lived with him and the children for about one year. At the time of the PC hearing, Mother was living in a small one-bedroom apartment with her mother (maternal grandmother). Although Mother stated she was working on getting beds for the children, it had not happened by the hearing date. Mother and paternal grandmother receive social security benefits, but Mother testified they struggle to pay the bills each month. As an example, the guardian ad litem ("GAL") testified that the rent was past due at the time of the PC hearing, less than two months after Mother moved there.

**{¶9}** The children have been with the same foster family since placement. They are bonded to the foster family and are thriving in their care. CW specifically, who is

several years older than MEW and experienced significant developmental delays, has made great progress with the family since his removal from Mother. At the time of the hearing, Mother was not seeing CW based on a recommendation from CW's psychiatric provider. The GAL for the children filed written reports and testified at the PC hearing. The GAL noted that while the children are bonded to Mother and Mother to her children, Mother struggles and "her capacity is limited by her comprehension." *Trial Tr.*, p. 136. The GAL recommended that PC be granted to the Agency. After reviewing the evidence from the PC hearing and the record in its entirety, the court determined that it was in the children's best interest to grant PC to the Agency and terminate Mother's parental rights.

## ASSIGNMENTS OF ERROR

{¶10} "I. THE JUVENILE COURT ERRED IN TERMINATING MOTHER'S PARENTAL RIGHTS AND GRANTING PERMANENT CUSTODY OF THE MINOR CHILDREN TO FCCPS."

{¶11} "II. MOTHER WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF HER SIXTH AND FOURTEENTH AMENDMENT RIGHTS AND HER RIGHTS UNDER THE OHIO CONSTITUTION."

## R.C. 2151.414(B)(1)

{¶12} The "right to raise a child is an 'essential' and 'basic' civil right." *In re T.C.,* 2020-Ohio-882, ¶ 35 (5th Dist.); *In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645 (1972). A parent has a fundamental liberty interest in the care, custody, and management of his or her child and an essential and basic civil right to raise his or her children. *Murray,* at 156. That right, however, is not absolute. "The natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed." *In re R.M., Jr.*, 2018-Ohio-395, ¶ 23 (5th Dist.) quoting, *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). When a court determines whether to permanently terminate parental rights, the court must grant the

affected parent "every procedural and substantive protection the law allows." *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991).

**{¶13}** Pursuant to R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to the agency that moved for permanent custody if the court determines, "by clear and convincing evidence, that it is in the best interest of the child" to do so and that one of the five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies. *In re A.W.*, 2024-Ohio-5791, ¶ 15 (5th Dist.). The five enumerated factors are as follows:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents;

(b) The child is abandoned;

(c) The child is orphaned and there are no relatives of the child who are able to take permanent custody; or

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; * * *

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

**{¶14}** Thus, R.C. 2151.414(B)(1) establishes a two-pronged analysis that the trial court must apply when ruling on a motion for permanent custody. *In re T.J.*, 2024-Ohio-110, ¶ 14 (5th Dist.); *In re A.M.*, 2020-Ohio-5102, ¶ 18. First, the court must find by clear and convincing evidence "that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies." *Id.* And second, the court must find by clear and convincing evidence that the grant of permanent custody is in the best interest of the child. *Id.*

## ANALYSIS

### *Plain Error Standard of Review*

**{¶15}** In the first assignment of error, Mother argues that the court's decision to grant PC is against the manifest weight of the evidence. Under a manifest weight analysis, if the children services agency presents clear and convincing evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, the court's decision is not against the manifest weight of the evidence. *In re R.M.*, 2013-Ohio-3588, ¶ 55 (4th Dist.); *In re K.H.*, 2008-Ohio-4825, ¶ 43; R.C. 2151.414(B)(1).

**{¶16}** "Clear and convincing evidence" is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. Thus, "[w]here the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient

evidence before it to satisfy the requisite degree of proof." *In re N.K.*, 2026-Ohio-1087, ¶ 56, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990).

**{¶17}** However, in the present case, because Mother did not object to the Magistrate's Decision, we must conduct a plain error analysis rather than manifest weight. *In re L.C.*, 2024-Ohio-147, ¶¶ 8-9 (11th Dist.); *In re G.S.*, 2025-Ohio-2949 (5th Dist.) (recognizing that in PC cases, failure to object to a Magistrate's decision results in a plain error analysis on appeal); *In re K.M.*, 2020-Ohio-3602, ¶ 22 (12th Dist.) (holding that, in a permanent custody case, "Mother's challenge is limited to plain error" where "Mother failed to object to the magistrate's decision as required by Juv.R. 40(D)(3)(b)").

**{¶18}** Juv.R. 40(D)(3)(b) establishes the procedure for objecting to a magistrate's decision and states that failure to object waives the right to assign error on appeal except for plain error. Thus, "[e]xcept for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law." Juv.R. 40(D)(3)(b)(iv).[2]

**{¶19}** To establish plain error, the complaining party must establish that an error occurred, the error was obvious, and the error affected his or her substantial rights. *State v. Ellison*, 2017-Ohio-284, ¶ 27 (4th Dist.); *State v. Spaulding*, 2016-Ohio-8126, ¶ 64. An error affects substantial rights only if it changes the outcome of the trial. *Id. State v. Lloyd*, 2021-Ohio-2420, ¶ 43 (5th Dist.). The burden of establishing plain error lies with the appellant. *Id.*, ¶ 44; G.S., ¶ 12. Here, Mother does not dispute that the children were in the Agency's custody for 12 or more months out of a consecutive 22-month period. Thus,

---

[2] "If no timely objections are filed, the trial court may adopt a magistrate's decision, unless it determines that there is an error of law or other defect evident on the face of the magistrate's decision." Juv.R. 40(D)(4)(c).

R.C. 2151.414(B)(1)(d) is clearly met. The appeal turns, then, on whether the trial court committed plain error in determining that PC was in the children's best interest.

### *Best Interest Determination*

{¶20} In determining the best interest of the child, R.C. 2151.414(D) mandates that the trial court consider all relevant factors, including, but not limited to the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody; and (5) whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶21} The court must consider each factor enumerated in R.C. 2151.414(D), as well as any other relevant factors, and no one factor is given greater weight than the others. *In re Schafer,* 2006-Ohio-5513. A juvenile court does not need to specifically list or discuss each of the best-interest factors to meet the mandate that it "consider" the factors in R.C. 2151.414(D). *A.M.*, ¶ 42. However, it must appear from the record that the trial court did in fact consider the factors listed as well as any other relevant factor. *Id.* (holding that although not required, it is preferable for a juvenile court to provide some discussion or analysis of the best-interest factors to aid in appellate review and to increase confidence in its decision).

{¶22} Importantly, the focus of the "best interest" determination is upon the child, not the parent. Indeed, R.C. 2151.414(C) expressly prohibits the court from considering

the effect a grant of permanent custody would have upon the parent. *A.W., supra*; *In re Awkal,* 85 Ohio App.3d 309 (8th Dist. 1994). Moreover, a child's best interest is generally served by the child being placed in a permanent situation that fosters growth, stability, and security. *T.C.*, ¶ 54.

**{¶23}** Here, the trial court articulated the best interest factors and discussed each one separately. Mother loves and is bonded to her children. The children are bonded to Mother and to their foster family. The children are doing well with the foster family and have been in the home for close to two years at the time of this appeal. The children are too young to express their wishes. However, the GAL provided reports and recommendations to the court in favor of granting PC. The GAL also testified at the hearing and reaffirmed her position. The children need a legally secure placement that cannot be accomplished without granting PC to the Agency. While everyone involved in this case acknowledges Mother's love for her children, and her progress towards case plan objectives, the children need consistent and proper care that fosters growth, stability, and security.

**{¶24}** As set forth above, the caseworker received an anonymous tip that Mother would test positive for drugs if she was tested, even though she had negative drug screens since July 2024. After receiving the tip, the caseworker tested Mother, and she was indeed positive for marijuana, methamphetamines, and amphetamines. Mother admitted to using but claimed she ingested marijuana tainted with methamphetamines, a similar argument that she made when the matters originated in 2024. While she did remain sober for most of the time during these cases, her use of drugs during the most critical phase is fatal to her demonstrating a legally secure placement for her children.

**{¶25}** Additional factors that remain concerning involve Mother's cognitive abilities to provide the care and safety her children need and deserve. Mother's housing situation appears fluid and she does not have reliable income other than social security benefits. Indeed, the GAL testified that the rent was already past due. *Trial Tr.*, p. 136. The GAL was present during several visits between Mother and her children. The GAL noted that while the children are bonded to Mother, Mother struggled and "her capacity is limited by her comprehension." *Id.* The GAL testified:

> She has struggled with applying skills that have been learned in - - with Help Me Grow. So, you know, there are things that we're redirecting her on. And even a year later when I'm supervising parenting time, I'm seeing similar issues, like issues getting a diaper on M.W. and it staying on M.W.; issues taking C.W. to the restroom and getting him to actually go to the restroom and not play in the toilet and not get anything on him and be able to wash his hands.
>
> Like in the time that I witnessed her take him to the restroom. He was slamming the toilet seat against the back of the toilet so violently that staff * * * had to come in and stop the situation because they were worried it was going to break the toilet tank, which could obviously be a huge injury concern for CW.
>
> *Id.*, pp. 136-137.

**{¶26}** The GAL went on to testify regarding supervision issues, housing, and Mother not making appropriate decisions. Mr. Trolley and the caseworker testified to similar issues and concerns regarding Mother's parenting skills and comprehension. For these reasons, the trial court did not commit plain error in granting PC to the Agency.

Even if this court reviewed under an alternate standard, we conclude that clear and convincing evidence exists to support granting PC. Mother's first assignment of error is overruled.

### *Ineffective Assistance of Counsel*

**{¶27}** In the second assignment of error, Mother claims her trial counsel was ineffective specifically for failing to object to the Magistrate's Decision. Claims of ineffective assistance of counsel are not forfeited by failure to object to a magistrate's decision. *In re S.N.*, 2020-Ohio-3958, ¶ 20 (1st Dist.); *L.C., supra* at ¶ 9. This Court recognizes "ineffective assistance" claims in permanent custody appeals. *In re Utt Children*, 2003-Ohio-4576 (5th Dist.). Indeed, where the proceedings involve the permanent termination of parental rights, the test for ineffective assistance of counsel used in criminal cases is equally applicable. *In re Wingo*, 2001-Ohio-2477 (4th Dist.); *In re Baby Girl O.*, 2023-Ohio-4323, ¶ 11 (5th Dist.). Thus, the applicable standard of review is as follows:

A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness. *Lockhart v. Fretwell* (1993), 506 U.S. 364, (1993); *Strickland v. Washington*, 466 U.S. 668 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989). In order to warrant a finding that trial counsel was ineffective, the petitioner must meet both the deficient performance and prejudice prongs of *Strickland* and *Bradley. Knowles v. Mirzayance,* 556 U.S. 111 (2009).

In light of "the variety of circumstances faced by defense counsel [and] the range of legitimate decisions regarding how best to represent a criminal defendant," the performance inquiry necessarily turns on "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, at 689. At all points, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.*

*Mansfield v. Studer,* 2012-Ohio-4840, ¶¶ 58-61 (5th Dist.).

**{¶28}** To prevail on an ineffective assistance of counsel argument, the person so claiming must establish two prongs: first, that his trial counsel's performance fell below an objective standard of reasonable representation involving a "substantial violation" of an essential duty to appellant. *Id.* This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Id.*; *Strickland*, at 687. Second, appellant must demonstrate actual prejudice by such alleged ineffectiveness. In other words, there must be a reasonable probability that *but for* counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland*, at 691-696. Further, an appellate court's review of trial counsel's actions and decisions is highly deferential, meaning strategic or tactical decisions will not form a basis for an ineffective assistance of counsel claim. *Id.*, at 689; *State v. Clayton*, 62 Ohio St.2d 45, 48-49 (1980); *State v. Mason*, 82 Ohio St.3d 144, 157-58 (1998) (stating that an appellate court may not second guess trial counsel's strategy decisions).

{¶29} Mother cannot demonstrate actual prejudice by her counsel's failure to object to the Magistrate's decision. For the reasons set forth above, there is simply nothing to suggest that the trial court's decision would have been different had counsel filed objections. The harsh reality of this case is that Mother has drug use issues and although she had negative drug screens for over one year, she decided for whatever reason to use again just before the PC hearing. The Agency made every attempt to develop appropriate case plans and goals for reunification, provided resources and support, assisted in visitation, explored kinship placements, and collected drug samples to ensure compliance. Thus, Mother's ineffective assistance of counsel claim fails. Mother's second assignment of error is overruled.

## CONCLUSION

{¶30} Mother's first and second assignments of error are overruled and the judgment of the Fairfield County Court of Common Pleas, Juvenile Division, is AFFIRMED.

{¶31} Costs to Appellant.

By: Montgomery, J.
Hoffman, P.J. and
Gormley, J. concur.