[Cite as *In re T.C.*, 2020-Ohio-882.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |  |
|---|---|---|---|
| IN THE MATTER OF: | : | JUDGES: |  |
|  | : | Hon. W. Scott Gwin, P.J. |  |
| T.C., X.C. & X.C. | : | Hon. Patricia A. Delaney, J. |  |
|  | : | Hon. Craig R. Baldwin, J. |  |
|  | : |  |  |
|  | : |  |  |
|  | : |  |  |
|  | : | Case Nos. | 2019CA00162 : |
|  |  | 2019CA00163 |  |
|  |  | 2019CA00164 |  |
|  | : |  |  |
|  | : |  |  |
|  | : | <u>OPINION</u> |  |

CHARACTER OF PROCEEDING:    Civil appeal from the Stark County Court of
Common Pleas, Juvenile Division, Case
Nos. 2017JCV01061, 2017JCV01062,&
2017JCV01063

JUDGMENT:    Affirmed

DATE OF JUDGMENT ENTRY:    March 9, 2020

APPEARANCES:

For Appellee                                                   For Appellant

BRANDON J. WALTENBAUGH              AARON KOVALCHIK
STARK COUNTY JFS                                116 Cleveland Avenue N.W.
402 2nd St. S.E.                                        Suite 808
Canton, OH  44702                                    Canton, OH 44702

*Gwin, P.J.*

{¶1} Appellant R.C. appeals from the September 26, 2019 judgment entry of the Stark County Court of Common Pleas, Juvenile Division, terminating his parental rights and granting permanent custody of T.C., X.C., and X.C., to the Stark County Department of Job and Family Services ("SCDJFS").

*Facts & Procedural History*

{¶2} R.C. is the father ("Father") of T.C., born June 1, 2007, X.C., born May 26, 2009, and X.C., born October 25, 2010. E.L. is the mother ("Mother") of the children.

{¶3} On August 25, 2017, SCDJFS filed a complaint of dependency and/or neglect with regards to T.C., X.C., and X.C. The complaint alleged, in part, that Mother was reported to be homeless after a domestic incident with her paramour, J.B; SCDJFS provided Mother and the children with housing for one week; SCDJFS directed Mother to contact the homeless hotline daily to find long-term housing; Mother never contacted the homeless hotline and returned to live with J.B. with the children; Mother then would not cooperate with the agency; the worker smelled marijuana during a home visit; Mother and J.B. refused to take a drug screen; the children were taken into emergency custody on August 24, 2017, after a drug raid on the home; Mother and J.B. were in the Stark County Jail; and Father was in the Stark County Jail on a felonious assault charge.

{¶4} The trial court appointed Amy Petrick ("Petrick") as guardian ad litem ("GAL") for the children on September 8, 2017. The trial court held a hearing on November 6, 2017. The trial court deleted the allegations of neglect. Mother and Father stipulated to a finding of dependency. The trial court placed the children into the temporary custody of SCDJFS.

{¶5} The magistrate held a further dispositional hearing on February 20, 2018. On April 25, 2018, SCDJFS filed a motion for immediate review/motion for no contact order. In the motion, SCDJFS stated that Father had recently been released from prison and was demanding visits with his children. The agency's position was that visits between Father and the children would be harmful until Father engaged in case management services. After a hearing on May 3, 2018, the magistrate issued a judgment entry finding that Father stipulated to the no contact order and that a no contact order would be in place until it was therapeutically recommended by the children's therapist/counselor that contact should resume.

{¶6} In May of 2018, the case plan was amended to add Father. Father's case plan required him to: complete a parenting evaluation; not expose the children to drug use or illegal activities; abstain from the use of drugs or alcohol; complete a drug and alcohol assessment and follow the recommendations of the evaluation; and submit to random drug screens. On June 24, 2018, SCDJFS filed a motion to extend temporary custody. The trial court granted the motion and extended temporary custody to SCDJFS until February 24, 2019. SCDJFS filed a second motion to extend temporary custody on January 18, 2019. The trial court granted the motion and extended temporary custody to SCDJFS until August 24, 2019.

{¶7} Father filed a motion to rescind the no contact order on July 16, 2019, seeking visitation with the children. SCDJFS filed a motion for permanent custody with regards to T.C., X.C., and X.C. on July 24, 2019. On July 25, 2019, Petrick filed a motion for permanent custody with regards to T.C., X.C., and X.C. On August 14, 2019, the

magistrate held a hearing and lifted the no contact order, allowing Father to begin to visit with the children when it was therapeutically recommended by the children's counselors.

{¶8}  The trial court conducted a trial on the motion for permanent custody on September 17, 2019.  Counsel for Mother stated that Mother did not contest the motion for permanent custody and felt it was in the best interest of the children for the motion to be granted.

{¶9}  Miah Kinlow ("Kinlow"), the caseworker for T.C., X.C., and X.C., was assigned to the case in June of 2018.  Kinlow testified the agency initially became involved with the children in 2017 when the children were removed by police from their home due to the home being raided for drugs and Mother's arrest.  The children have been in the temporary custody of the agency since November of 2017.  Kinlow stated the agency asked for a no contact order with regards to Father during the case because there were concerns with his criminal history.  He had just been released from prison for discharging a weapon in front of children.  The no contact order was in place from May of 2018 through August 14, 2019.  Thus, Father had no contact with the children for a period in excess of ninety days.  Kinlow testified no visits between the children and Father have occurred since August 14, 2019.  Father was released from prison in February of 2018.  From February of 2018 until August 14th, Father did not call Kinlow and request to visit the children.  Since the no contact order was lifted on August 14, 2019, Father never contacted Kinlow to visit the children.

{¶10}  As to Father's case plan, Kinlow stated Father was to complete a parenting assessment, which he completed in May of 2018.  Additionally, father was to:  comply with all aspects of his parole, complete an anger management program, attend individual

counseling, and complete the Goodwill parenting program.  The requirements in his case plan were delayed because Father was in prison.  At the time of the hearing, Father had recently completed his probation and recently completed anger management.   Kinlow was unsure if Father completed individual counseling.  Kinlow testified Father waited too long to complete his case plan services; thus, as a result, the children have been in the agency's custody for two years.  Additionally, the children have not spent any time with Father in over a year.  Kinlow stated the children do not mention Father much and have worked with their counselors as to their issues with Father.

{¶11}  Kinlow testified the agency has made reasonable efforts at reunification and believes there are compelling reasons to grant permanent custody to SCDJFS.  Further, that the children are bonded with their foster family, are finding stability in their foster home, and are thriving in their foster home.

{¶12}  On cross-examination, Kinlow testified Father has completed everything that has been asked of him with the exception of the Goodwill Parenting Program.  Kinlow did not ask for Father to be put into Goodwill Parenting because Father first had to complete his anger management program, and Father was not finished with his anger management program when the agency filed for permanent custody.  Kinlow did not look into another parenting program.  Father is currently employed as a store manager at Metro PCS.

{¶13}  Kinlow also testified at the best interest portion of the trial.  T.C. has some issues, but is currently in counseling. T.C., X.C., and X.C. are all in the same foster home, and have been in this foster home since September of 2017.  Kinlow stated the children are happy in the foster home and are doing well.  They are bonded to their foster parents

and Kinlow has seen a positive change in the children in the foster home. Kinlow has not observed any visits between the children and Father. Kinlow believes the children will benefit from permanency and adoption. T.C. told Kinlow she was sad she would not be reunified with Mother, but stated if she could not be with Mother, she would like to remain in the foster home. Both X.C. and X.C. told Kinlow they would like to remain in the foster home. Kinlow stated the children do not talk much about Father, but, when they do, it is generally about things in the past. Kinlow believes it is in the best interest of the children for permanent custody to be granted to SCDJFS.

{¶14} Dr. Amy Thomas ("Thomas") of Lighthouse Family Center previously worked for Northeast Ohio Behavioral Health. She completed Father's parenting evaluation. Thomas was concerned about Father's mental health because of his perception that he may be a prophet and she was also concerned about Father's criminal history, including recent charges that included firing a gun at the mother of one of his children in the presence of some of his younger children. Thomas was concerned Father's grandiosity with the belief he was a prophet would cause him to disregard information as it relates to his children or his participation in treatment. Thomas categorized this as a "barrier that it's really difficult to get beyond."

{¶15} Father did not understand how his behaviors impacted others because he perceived himself as a victim. Father reported to Thomas that he was in a psychiatric hospital as a child, he was removed from his home at age three or four, he was physically abused in a foster home, and had a juvenile justice history. Thomas stated Father continued to be involved in the criminal justice system into adulthood, which interfered with his relationships with his children due to repeated incarcerations.

{¶16} Father told Thomas he has twelve children, with his romantic relationships sometimes overlapping with one another. Father acknowledged there was some physical violence in all of his relationships except one. Thomas noted a pattern by Father of when he felt cheated on or slighted by a woman, he would react in anger.

{¶17} Thomas diagnosed Father with other specified trauma and stressor related disorder, major depressive disorder, anti-social personality disorder, narcissist traits, and a provisional diagnosis of a delusional disorder. Thomas made recommendations, but believed his prognosis was not favorable because of his mental health concerns, criminal history, domestic violence history, victim mentality, and his lack of insight. Thomas testified successful completion of services is not just going through the motions, but also includes the demonstration by Father that he had made significant changes based upon the new information. Thomas' recommendations for Father included: continue the HOPE program through the courts, continue to take his prescribed medications, complete anger management, complete Goodwill Parenting, avoid further involvement with the criminal justice system, maintain emotional stability, gain meaningful employment, and home-based services.

{¶18} Father called as a witness Kelly Stuhldreher ("Stuhldreher"), a counselor at Summit Psychological Associates, who worked with Father through the HOPE program, which is a form of mental health probation. Stuhldreher testified that Father completed the counseling requirements for the HOPE track. She believes Father benefited from the counseling. On cross-examination, Stuhldreher testified treatment through the HOPE program does not touch at all on Father's ability to parent his children.

{¶19} Father next called Sandra Fronimo ("Fronimo") as a witness. Fronimo is employed at the Voyager Program, an anger management program that Father was a part of through his probation. Fronimo stated Father is almost finished with the program, as he has one more assignment to do to complete the program. Fronimo testified Father made remarkable changes throughout the year, including taking ownership of his behavior and not blaming other people for his behavior. Father told Fronimo he wanted to be a role model for his children. On cross-examination, Fronimo stated the Voyager Program does not include Father's children at all and she has never observed him in his relationships with his children.

{¶20} Father called witness Ashley Williamson ("Williamson") of Stark County Adult Probation, who supervises Father while he is on probation. While Father had some bumps to begin with, Williamson stated that, as of the last six months, Father has had no issues. Father successfully completed the re-entry program and maintained employment. On cross-examination, Williamson testified Father is approximately halfway through his three-year probation period. Further, that she has not had any involvement with Father with regards to his children, but it was reported to her that Father has eighteen children.

{¶21} Father called Nicole Flores ("Flores"), his direct supervisor at Elite Wireless Group, an authorized dealer for Metro PCS. Flores testified that Father is an excellent employee, he is very responsible, and she relies on him. Flores has never seen Father with his children.

{¶22} Father testified that he has done everything he has been asked to do in this case. Father testified he has fourteen children, including one child that passed away and one that was adopted. Father has a relationship with all of his children except T.C., X.C.,

and X.C. Father does not think there is any reason why he should not be around these children, as he previously cared for them when Mother abandoned them approximately two years ago. Father has been employed since May of 2018 and now is a manager. Father is trying to consolidate his child support since he is supporting twelve children.

{¶23} On cross-examination, Father testified his youngest child was born in June of 2019. Father has "no earthly idea" how behind he is in child support payments. Father sends his children in Cleveland money every couple of weeks. Father is on good terms with T.T., the person he was accused of having a gun around. Father last saw T.C., X.C., and X.C. in approximately June or July of 2017. It has been about two years since Father has seen the children. Father testified he thought the counselors were going to contact him with regards to visiting the children, so he did not contact the counselors or Kinlow with regards to visitation.

{¶24} Petrick filed a report recommending permanent custody of the children be granted to SCDJFS. Petrick feels strongly that permanency needs to be established for the children. While Petrick noted that Father has complied with his case plan, she stated he has made no effort to establish a relationship with the children. The children have told Petrick they are happy, safe, and loved in their current placement and want to remain there with visits from Mother. Petrick stated the children have told her they want to remain in their current placement if they cannot be with Mother multiple times over the course of the pendency of the case, the most recent being in August of 2019.

{¶25} Petrick attended the trial, but her recommendation did not change based upon the testimony she heard. Petrick stated she has seen the children once or twice a month since 2017, and the children have always stated if they could not be with Mother,

they wanted to remain in the foster home.  When Petrick asked the children about their father, they thought she was talking about Mother's boyfriend J.B., as they called him their father.  Petrick stated the children do not want to live with Father because they do not know him and have not seen him in almost four years.  Petrick strongly believes is in the children's best interest for permanent custody to be granted to SCDJFS.

{¶26}  The trial court issued a judgment entry on September 26, 2019 terminating Father's parental rights with regards to T.C., X.C., and X.C., and granting permanent custody of the children to SCDJFS.  Simultaneously, the trial court issued extensive findings of fact and conclusions of law.  The trial court found Kinlow's testimony to be credible.  The trial court determined that since T.C., X.C., and X.C. have continuously remained in the custody of SCDJFS from November 6, 2017 until the date of the hearing on September 17, 2019, the children have been in the custody of the agency for a period greater than twelve months of a consecutive twenty-two month period.  As to Father's visitation, the trial court found no visits have occurred for a period in excess of ninety days; thus, Father has abandoned T.C., X.C., and X.C.

{¶27}  The trial court found that when Father completed his parenting assessment, the children had been in agency custody for ten months; when he completed his counseling, the children had been in agency custody for seventeen months; Father has not yet completed Goodwill Parenting Class because he had to first finish anger management counseling; Father has had no contact with the children for over one year; and the children do not talk about Father much.

{¶28}  The trial court found Thomas gave credible testimony.  Further, that it was Thomas' expert opinion that Father would have to not only complete the various programs

in his case plan, but would have to demonstrate changes; however, at the time of trial, the children had been in the custody of the agency for over two years. The court shared Thomas' concern about Father's stability resulting from Father reporting to Thomas that he was filled with the Holy Ghost, experiences prophetic dreams, and was able to speak in tongues. The trial court found: Father was incarcerated from 2000 until 2004; Father denied using drugs, but he tested positive for drugs in May of 2018; Father failed to accept personal responsibility for his problematic choices; Father's denials and perception of himself interfere with his ability to make the changes necessary to raise his children safety and competently; Father's inability to prioritize the safety of his children is illustrated by his decision to shoot at the mother of some of his children in the presence of their children; and Thomas' report was insightful with regard to Father's psychological issues and how those issues negatively affect his ability to parent.

{¶29} The trial court found Stuhldreher gave credible testimony, but also found she acknowledged the HOPE program does not deal with Father's ability to parent. Similarly, the trial court found Fronimo gave credible testimony, but she acknowledged she has never observed Father interact with the children and Father had not yet completed the Voyager program. As to Father's testimony, the trial court found he seemed to dodge responsibility with regards to certain incidents; his lack of understanding as to his role in his criminal acts was evident during his testimony where Father admitted he discharged a gun around a minor child, but minimized his responsibility when he testified he went to prison because of a plea deal; and Father focuses on the technicalities, not the realities, of his criminal situation.

{¶30} The trial court issued the following decision as to permanency and placement:  Father abandoned T.C., X.C., and X.C. by failing to visit or maintain contact with them for more than ninety days; notwithstanding reasonable case planning and diligent efforts by the agency, Father has failed to remedy the conditions that caused T.C., X.C., and X.C. to be placed; and the children cannot be placed with either parent within a reasonable time, nor should they be placed with either parent.

{¶31}  As to the best interest determination, the trial court set forth the relevant statutory factors.  The trial court found: Kinlow's testimony as to best interest was credible; the children have been placed together in a foster home since 2017; they maintain contact with a half-sibling; the children are happy at the foster home and are involved in many extra-curricular activities; the children are thriving and only positive changes have been noted; the children are bonded to the foster mothers; the foster mothers want to adopt the children; there have been no visits between Father and the children since the beginning of the case; the children are sad they are not going back to Mother, but are open to adoption by their current foster placement; the potential of harm of severing the potential bond of either parent is outweighed by the benefit of permanency for T.C., X.C., and X.C.; Kinlow testified permanent custody to the agency was in the children's best interest; Petrick recommended the permanent custody of the children to SCDJFS; and Petrick believes it would be detrimental to remove the children from the foster home.  The trial court concluded that, despite the minimal bond that may have developed between Father and T.C., X.C., and X.C., the harm caused by severing the bond with Father is outweighed by the benefits of permanency in each child's life; and it is in the best interest of the

children to grant permanent custody to SCDJFS, as they deserve to be in a stable and loving environment.

{¶32}  Father appeals the September 26, 2019 judgment entry of the Stark County Court of Common Pleas, Juvenile Division, and assigns the following as error:

{¶33}  "I. THE JUDGMENT OF THE TRIAL COURT THAT THE MINOR CHILDREN CANNOT AND SHOULD NOT BE PLACED WITH APPELLANT AT THIS TIME OR WITHIN A REASONABLE PERIOD OF TIME WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

{¶34}  "II. THE JUDGMENT OF THE TRIAL COURT THAT THE BEST INTEREST OF THE MINOR CHILDREN WOULD BE SERVED BY GRANTING OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

*Permanent Custody*

{¶35}  "[T]he right to raise a child is an 'essential' and 'basic' civil right.'"  *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).  An award of permanent custody must be based on clear and convincing evidence.  R.C. 2151.414(B)(1).

{¶36}  Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."  *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954).  "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof."  *Id.* at 477.  If some competent, credible evidence going to

all the essential elements of the case supports the trial court's judgment, an appellate court must affirm the judgment and not substitute its judgment for that of the trial court. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

{¶37} Issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier of fact. *Seasons Coal v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger,* 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

{¶38} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency.

{¶39} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or

more months of a consecutive twenty-two month period ending on or after March 18, 1999.

{¶40} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, a trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

I.

{¶41} In his first assignment of error, Father argues the finding that the children cannot or should not be placed with Father within a reasonable time was not proven by clear and convincing evidence. Father cites to the testimony that he did everything he could do on his case plan, including completing the parenting assessment, completing counseling, completing anger management, doing well on probation, and obtaining stable employment.

{¶42} We first note that the trial court determined, pursuant to R.C. 2151.414(B)(1)(d), the children had been in the temporary custody of the agency for a period of time in excess of twelve of the prior twenty-two consecutive months. Kinlow testified the children were placed into the temporary custody of SCDJFS in November of 2017 and were continuously in the temporary custody of the agency until September 17, 2019, the date of the trial. Thus, the children have been in the custody of the agency for more than twelve out of the last twenty-two months.

{¶43} As findings under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d) are alternative findings, each is independently sufficient to use as a basis to grant the motion

for permanent custody. *In re Daltoni*, 5th Dist. Tuscarawas No. 2007 AP 0041, 2007-Ohio-5805. This finding alone, in conjunction with a best interest finding, is sufficient to support the grant of permanent custody. *In re Calhoun*, 5th Dist. Stark No. 2008CA00118, 2008-Ohio-5458.

{¶44} Additionally, in this case, the trial court found, by clear and convincing evidence, that Father abandoned the children pursuant to R.C. 2151.414(B)(1)(b). Pursuant to R.C. 2151.011(C), a child is "presumed abandoned when the parties of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." We find there is competent and credible evidence to support this determination. Kinlow testified that Father had no contact with the children for a period in excess of ninety days, as there was a no contact order in place starting when Father was released from prison in 2018 until August of 2019. Kinlow further stated Father has not seen the children after the no contact order was lifted in August of 2019, as he never contacted Kinlow for visitation. On cross-examination, Father testified he last had contact with the children in June or July of 2017 and it has been about two years since he has seen the children. Petrick testified the children have not seen Father for almost four years.

{¶45} A trial court's finding of abandonment under R.C. 2151.414(B)(1)(b) will satisfy the first prong of the permanent custody test, independent of a finding under R.C. 2151.414(B)(1)(a), allowing the court to move on to the second prong of considering whether the grant of permanent custody to the agency is in the best interest of the child. *In re A.M.*, 5th Dist. Stark No. 2013 CA 00113, 2013-Ohio-4152.

{¶46} Because Father has not challenged the twelve of twenty-two month finding or the finding of abandonment, we would not need to address the merits of this assignment of error. However, even if we consider Father's argument, the trial court did not err in determining the children cannot be placed with Father at this time or within a reasonable period of time. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.

{¶47} A review of the record supports the trial court's conclusion that the children cannot be placed with Father within a reasonable time. Father's incarceration significantly impacted his ability to complete his case plan objectives in a reasonable amount of time. Kinlow testified Father waited too long to complete his case plan services and, as a result, the children have now been in the agency's custody for over two years. As noted by the trial court, when Father completed his parenting assessment the children had been in agency custody for ten months and when he completed his counseling, the children had been in agency custody for seventeen months. Further, Kinlow stated the children have not had contact with Father for over a year. Thomas testified that Father's grandiosity and belief he was a prophet caused him to disregard information as it relates to his children or participating in treatment. Thomas categorized this as a "barrier that it's really difficult to get beyond." Additionally, Thomas stated it was not enough for Father to simply complete his case plan, but he had to demonstrate he had made real changes based upon the completion of the plan and treatment. Petrick feels strongly that permanency

needs to be established for the children.  Even though the children have been in the custody of the agency for two years, Petrick stated Father has made no effort to establish a relationship with the children.

{¶48}  Father's argument centers around the fact that he did everything that was asked of him during the case and substantially completed his case plan.  The witnesses called by Father testified to his completion of various programs.  However, Stuhldreher testified the HOPE program does not touch on Father's ability to parent and Fromino stated the Voyager anger management program does not include children and she never saw Father with his children. Similarly, Williamson testified she has no involvement with Father with regards to his children.  As this Court has held, the successful completion of a case plan is not dispositive on the issue of reunification.  *In the Matter of A.H.*, 5th Dist. Richland No. 18CA96, 2019-Ohio-1509.  While it may be in Father's best interest to complete the case plan, this is only one factor for the trial court to consider.  *Id.*

{¶49}  We find there is competent and credible evidence to support the trial court's finding that the children cannot be placed with Father within a reasonable amount of time.

{¶50}  Father's first assignment of error is overruled.

II.

{¶51}  In his second assignment of error, Father contends the trial court's determination that the best interest of the children would be served by the granting of permanent custody to SCDJFS was against the manifest weight and sufficiency of the evidence.  Father argues the testimony at trial showed the children only had positive memories of him and a bond exists between him and the children.  Further, that his testimony demonstrates he is capable and willing to be a parent.

{¶52} We have frequently noted, "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re Mauzy Children,* 5th Dist. No. 2000CA00244, 2000 WL 1700073 (Nov. 13, 2000), citing *In re Awkal,* 85 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist. 1994).

{¶53} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody; and (e) whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child. No one element is given greater weight or heightened significance. *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816.

{¶54} A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security. The willingness of a relative to care for the child does not alter what a court considers in determining permanent custody. *In re Patterson,* 134 Ohio App.3d 119, 730 N.E.2d 439 (9th Dist. 1999); *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 574 N.E.2d 1055 (1991). Accordingly, a court is not

required to favor a relative if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody. *In re R.P. and I.S.*, 5th Dist. Tuscarawas No. 2011AP050024, 2011-Ohio-5378.

{¶55} The court must consider all of the elements in R.C. 2151.414(D) as well as other relevant factors. There is not one element that is given greater weight than the others pursuant to the statute. *In re Schafer*, 11 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532. *In re Schafer* made it clear that a trial court's statutory duty, when determining whether it is in the best interest of a child to grant permanent custody to an agency, does not include finding by clear and convincing evidence that no suitable relative was available for placement. *Id.* R.C. 2151.414 "requires the court to find the best option for the child once a determination has been made pursuant to R.C. 2151.414(B)(1)(a) through (d). The statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors." *Id.* at 111.

{¶56} The focus of the "best interest" determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents. *In re: Awkal*, 95 Ohio App.3d 309, 315.

{¶57} We find the trial court did not err in finding that granting permanent custody to SCDJFS was in the best interest of T.C., X.C., and X.C. Kinlow and Petrick both testified that granting permanent custody to SCDJFS would be in the best interest of the children. Similarly, both believe that permanency needs to be established for the children, as they have been in the custody of agency for two years. The children have not had any

contact with Father for over a year and, as noted by Petrick, even though Father has complied with his case plan, he has made no effort to establish a relationship with the children. Petrick testified the children do not want to live with Father because they have not seen him in almost four years.

{¶58} The children are in the same foster home, and have been in this foster home since September of 2017. Kinlow stated the children are happy, bonded to the foster parents, and are doing well. While in the foster placement, the children visit with Mother and their half-sibling. Kinlow believes the children will benefit from permanency and adoption. Petrick has seen the children once or twice a month since September of 2017 and she strongly believes it is in the best interest of the children to have permanency in their lives. The children have told both Kinlow and Petrick that if they cannot live with Mother, they want to remain in their current placement.

{¶59} We find the trial court properly considered and weighed the factors in R.C. 2151.414(D) and the trial court's conclusion that the granting of permanent custody to SCDJFS is in the best interest of the children is supported by competent and credible evidence. Father's second assignment of error is overruled.

{¶60}   Based on the foregoing, we find the trial court did not abuse its discretion in granting permanent custody of T.C., X.C., and X.C. to SCDJFS.  Father's assignments of error are overruled and the September 26, 2019 judgment entry of the Stark County Court of Common Pleas, Juvenile Division, is affirmed.

By Gwin, P.J.,

Delaney, J., and

Baldwin, J., concur