[Cite as *In re I.F.*, 2026-Ohio-844.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

IN RE I.F.

IN RE N.F.

Case No. 2025 CA 00082 and
Case No. 2025 CA 00083

<u>Opinion And Judgment Entry</u>

Appeal from the Licking County Common Pleas
Court, Juvenile Division, Case Nos. F2024-
0131 and F2024-0293

Judgment: Affirmed

Date of Judgment Entry: March 11, 2026

**BEFORE:** Craig R. Baldwin; Robert G. Montgomery; David M. Gormley, Judges

**APPEARANCES:** JERMAINE L. COLQUITT, for Appellant, Mother; JENNY WELLS,
Licking County Prosecuting Attorney by KENNETH W. OSWALT, for Licking County Job
and Family Services; CAROLYNN E. FITTRO, GAL; and EDWARD ITAYIM, for Father.

*Montgomery, J.*

{¶1}   Biological mother, Briauna Robinson/Freeman, appeals from the judgment
of the Licking County Court of Common Pleas, Juvenile Division, granting permanent
custody of her two children, I.F. and N.F., to Licking County Job and Family Services.
For the reasons below, we AFFIRM.

**STATEMENT OF CASE**

{¶2} This matter involves dependency proceedings for two minor children, I.F. and N.F., who share biological mother, B.F. ("Mother"). On May 8, 2025, the Licking County Job and Family Services (the "Agency") filed the respective motions for permanent custody ("PC"). On August 6, 2025, the PC hearing took place. Mother appeared with counsel and opposed the Agency's motion.

{¶3} In support of the Motion, the Agency presented testimony from four (4) witnesses - Briauna Freeman, Mother, as if on cross; Jeffrey Freeman Sr., Paternal Grandfather; Jennifer Delancey, Foster Caregiver; and Matthew Tracy, Ongoing Agency Caseworker. The State also presented Exhibit A, the Updated Family Case Plan filed on July 9, 2025, admitted without objection. On behalf of Mother, Attorney Collins presented Mother's testimony and had the opportunity to cross-examine the witnesses and evidence presented by the Agency. Father's attorney did not present any witnesses or evidence but likewise had the opportunity to cross-examine the witnesses and evidence. Finally, the Guardian Ad Litem ("GAL"), Carolynn Fittro, Esq., presented testimony and her written report with recommendations were admitted into evidence.

{¶4} On October 10, 2025, the Court granted the Agency's motion for PC. The trial court determined that clear and convincing evidence existed (1) that the children could not or should not be placed with either parent within a reasonable period of time under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E), and (2) that PC was in I.F. and N.F.'s best interest. As a result, mother's parental rights were terminated. Mother has timely appealed.

## STATEMENT OF RELEVANT FACTS

{¶5}    The record demonstrates the following facts.  The two minor children at issue in this appeal are I.F., born on April 28, 2023, and N.F., born on July 28, 2024.  The biological father ("Father") is currently incarcerated.  Mother has a third child, P.F., who was born on March 4, 2022, who is not involved in this appeal but was previously involved with the Agency.  On December 22, 2022, P.F. was removed from Mother and Father's home, due to domestic violence, mental health concerns, housing issues and income stability concerns. The paternal grandfather was awarded temporary custody of P.F. and to date, P.F. remains under his care and control.

{¶6}    Shortly after P.F.'s removal, on April 28, 2023, I.F. was born, and because Mother and Father were continuing services with the Agency and making progress on the case plan in place, I.F. initially remained in the parents' care.  Mother and Father were engaged in weekly parenting education with a parenting coach, and the Agency was providing financial assistance to them with the goal of housing and income stability. However, in January of 2024, Mother contacted Caseworker Matthew Tracy ("Caseworker Tracy") reporting another incident of domestic violence between her and Father.  Mother fled to a neighbor's home and called the police.  Mother and Father both had marks on them from the incident, and a police report was filed.  Father was later charged with domestic violence, a third-degree felony.

{¶7}    The Agency removed I.F. from the home due to concerns of domestic violence and mental health issues.  On January 29, 2024, an ex parte order of removal was requested and granted for I.F.  On May 28, 2024, I.F. was adjudicated a dependent

child.[1]  An uncontested dispositional hearing immediately followed, and I.F. was placed in the temporary custody of the Agency.  Mother and Father appeared for both the adjudicatory and dispositional hearings.  Following I.F.'s removal, the criminal charges against Father were dismissed due to Mother's refusal to testify before the grand jury.  A second grand jury was supposed to take place, but Mother and Father instead got married and Mother would not testify against Father.

{¶8}   During 2024, Mother and Father each had escalating mental health incidents, including Father's hospitalizations for suicidal ideations, and threats of harm to self and/or to others.  Incidents of domestic violence also continued to occur, including an incident when Caseworker Tracy was present and had to physically separate the parents to de-escalate the situation.  In June of 2024, both parents were charged with and pled guilty to the offense of prohibitions concerning companion animals, and both were sentenced to two (2) weeks' incarceration.  One month later, on July 28, 2024, N.F. was born.  N.F. was removed from Mother and Father shortly after her birth.  In September 2024, Mother filed and received a civil protection order on the advice of her then counselor.  However, within a few days of the order being issued, Caseworker Tracy saw Mother and Father together at the library, and Mother told Caseworker Tracy that her therapist pushed her into getting that order.

{¶9}   On October 4, 2024, N.F. was adjudicated dependent and placed in the Agency's temporary custody.  N.F. was placed in the same foster home as I.F., and both have remained in that foster home since their respective removals. The testimony demonstrates that the foster parents are making sure that all the children's needs are

---

[1] The original dependency complaint was promptly filed on January 30, 2024; however, due to timing issues, the dependency complaint was re-filed, and the hearing was held on May 28, 2024.

being met.  N.F. has adjusted seamlessly and is developmentally on target, meeting all milestones.  She is very bonded to everyone in the home.  I.F. has a few special needs that the foster family noticed and promptly addressed, and they continue to support I.F. in whatever he needs.  I.F. was quick to bond with the foster family's single son, and is bonded to the foster parents, but was slower to bond with the in-laws living in the home. The foster family is very open to adopting both children.

{¶10}  The GAL filed her written report and recommendations on August 5, 2025, in which she recommended that it would be in the best interests of the children for the Court to grant the Motion for PC.   The GAL also testified and reiterated her recommendation and belief that a grant of permanent custody would be in the best interests of I.F. and N.F., despite Mother's recent improvements.  The GAL based her recommendations on Mother's continual issues with housing, income, finances, and mental health, the cycle of engagement and disengagement from Agency services; Father's incarceration (meaning he would not be able to help Mother); concerns of continued domestic violence; and her belief that, even if given more time, Mother and Father would not be able to safely provide for the needs of the children.

{¶11}  As stated, Father was incarcerated and serving a twenty-seven-month prison sentence at the time of the permanent custody trial.  As a result, Father was removed from the case plan.  No further incidents of domestic violence involving Mother occurred following Father's incarceration.

{¶12}  Mother testified on her own behalf at the PC hearing.  According to her, she remained engaged in services throughout the case, maintained employment, participated in parenting education, and attended visitation with the children. Mother's visits were

appropriate, and her parenting improved during the pendency of the case.  Indeed, at the outset of the PC hearing, Mother requested that the Court consider an extension to allow additional time for reunification based on her ongoing progress and an identified housing opportunity anticipated for September of 2025.  *Tr.,* at pp. 8-11. The Agency acknowledged that, if an extension were granted, it would consider expanding Mother's visitation to unsupervised visits. *Tr.,* at pp. 150-151.

**{¶13}** Importantly, upon assignment of P.F.'s case in 2022, the Agency caseworker at the time established a case plan outlining the Agency's concerns as well as the objectives for Mother and Father to attempt reunification.  Said case plan was filed with the Court on September 20, 2022.  Caseworker Tracy took over in 2023, and after I.F.'s birth in April 2023, filed an updated case plan with the Court, and after N.F.'s birth, filed another updated plan.  Each case plan remained consistent with its objectives set forth in late 2022.  The case plan was updated yet again to remove Father after his conviction on five (5) counts of swatting, felonies of the fourth degree, and subsequent (current) sentence of twenty-seven (27) months in prison.

**{¶14}**  The objectives identified in the case plans for Mother and Father to address the concerns that led to the removal of I.F. and N.F included completing a mental health assessment; maintaining stable income; obtaining and maintaining safe and appropriate housing; each parent addressing their domestically violent behaviors; completing an Agency approved parenting skills course; and addressing pending criminal charges.  Caseworker Tracy confirmed that Mother and Father received the case plan and understood the contents and its objectives.

## ASSIGNMENTS OF ERROR

**{¶15}** "I.    THE TRIAL COURT ERRED IN FINDING THAT THE CHILDREN COULD NOT BE PLACED WITH MOTHER WITHIN A REASONABLE TIME PURSUANT TO R.C. 2151.414(B)(1)(A), BECAUSE THE FINDINGS UNDER R.C. 2151.414(E)(1), (E)(4), AND (E)(16) AS TO MOTHER ARE NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**{¶16}** "II.    THE TRIAL COURT'S BEST-INTEREST DETERMINATION UNDER R.C. 2151.414(D)(1) IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

## STANDARD OF REVIEW

**{¶17}** Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to the agency that moved for permanent custody if the court determines, "by clear and convincing evidence, that it is in the best interest of the child" to do so and that any of five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies. *In re A.W.,* 2024-Ohio-5791, ¶ 15.

**{¶18}** "A reviewing court will not reverse a trial court's judgment in a permanent custody case unless it is against the manifest weight of the evidence." *In re V.C.*, 2024-Ohio-5153, ¶ 23 (4th Dist.), citing *In re C.S.*, 2019-Ohio-5109, ¶ 21 (4th Dist.).  Thus, if the children services agency presented evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence. *In re R.M.*, 2013-Ohio-3588, ¶ 55 (4th Dist.); *In re K.H.*, 2008-Ohio-4825, ¶ 43; R.C. 2151.414(B)(1). "Clear and convincing evidence" is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases and which will produce in the mind of the

trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

**{¶19}** The credibility of witnesses and the weight to be given the evidence are primarily issues for the trier of fact. *In re A.H.,* 2024-Ohio-4694, ¶¶ 30-31 (5th Dist.). "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77 (1984). Credibility determinations are best suited for the trial court and are "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 1997-Ohio-260; *see also*, *In re Christian*, 2004-Ohio-3146 (4th Dist.); *In re C.W.*, 2004-Ohio-2040 (2d Dist.).

**{¶20}** In conducting this deferential review, the court remains mindful that "the right to raise a child is an 'essential' and 'basic' civil right.' " *In re T.C.,* 2020-Ohio-882, ¶ 35; *In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645 (1972). A parent has a fundamental liberty interest in the care, custody, and management of his or her child and an essential and basic civil right to raise his or her children. *Murray,* at 156. That right, however, is not absolute. "The natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed." *In re R.M., Jr.,* 2018-Ohio-395, ¶ 23 (5th Dist.) quoting, *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). When a court determines whether to permanently terminate parental rights, the court must grant the affected parent

"every procedural and substantive protection the law allows." *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991).

## APPLICABLE LAW

{¶21} R.C. 2151.414(B)(1) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency; <u>and</u> that one of the following applies:

(a)     The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents;

(b)     The child is abandoned;

(c)     The child is orphaned and there are no relatives of the child who are able to take permanent custody; or

(d)     The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; * * *

(e)     The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

**{¶22}** Thus, R.C. 2151.414(B)(1) establishes a two-pronged analysis that the trial court must apply when ruling on a motion for permanent custody. *In re T.J.,* 2024-Ohio-110, ¶ 14 (5th Dist.); *In re A.M.,* 2020-Ohio-5102, ¶ 18. First, the court must find by clear and convincing evidence "that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies." *Id.* And second, the court must find by clear and convincing evidence that the grant of permanent custody is in the best interest of the child. *Id.*

**{¶23}** Relevant here, under (B)(1)(a), PC may be granted if the child cannot or should not be returned to the parent within a reasonable time. *In re K.J.,* 2025-Ohio-4562 (9th Dist.). In making that determination, the court must consider the sixteen factors listed in R.C. 2151.414(E), as well as any other relevant evidence. *See* R.C. 2151.414(E). *Id.,* ¶ 19. Importantly, R.C. 2151.414(E) expressly states that if the court makes even <u>one</u> finding under R.C. 2151.414(E)(1)-(15), the court shall determine the children cannot or should not be placed with the parent. As such, a trial court shall base its decision that a child cannot be placed with a parent within a reasonable time or should not be placed with a parent upon the existence of any one of the R.C. 2151.414(E) factors. *Id.; see In re William S.,* 1996-Ohio-182; *In re S.B.,* 2025-Ohio-2685, ¶ 17 (8th Dist.).

**{¶24}** Once the court makes the appropriate finding under R.C. 2151.414(B)(1), it must determine whether PC is in the best interest of the child. In determining the best interest of the child, R.C. 2151.414(D) mandates the trial court consider all relevant factors, including, but not limited to the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with

due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody; and (5) whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶25} The court must consider each factor enumerated in R.C. 2151.414(D), as well as any other relevant factors, and no one factor is given greater weight than the others. *In re Schafer,* 2006-Ohio-5513. A juvenile court does not need to specifically list or discuss each of the best-interest factors to meet the mandate that it "consider" the factors in R.C. 2151.414(D). *A.M.*, at ¶ 42. However, it must appear from the record that the trial court did in fact consider the factors listed as well as any other relevant factor. *Id.* (holding that although not required, it is preferable for a juvenile court to provide some discussion or analysis of the best-interest factors to aid in appellate review and to increase confidence in its decision).

{¶26} Importantly, the focus of the "best interest" determination is upon the child, not the parent. Indeed, R.C. 2151.414(C) expressly prohibits the court from considering the effect a grant of permanent custody would have upon the parents. *In re A.W.*, 2025-Ohio-853 (5th Dist.); *In re Awkal,* 85 Ohio App.3d 309 (8th Dist. 1994). As well, a child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security. *T.C.*, at ¶ 54.

## ANALYSIS
### R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E)(1)

{¶27} In the first assignment of error, Appellant claims the trial court's findings to support that the children cannot be placed with Mother within a reasonable time are

against the manifest weight of the evidence. We disagree. As stated above, the trial court found that the R.C. 2151.414(E)(1), (E)(4), and (E)(16) applied in this case as to Mother.[2]

{¶28} In conjunction with R.C. 2151.414(B)(1)(a), that a child cannot or should not be placed with a parent within a reasonable time, R.C. 2151.414(E)(1) requires the trial court to determine whether, despite reasonable case planning and diligent efforts by the agency, the parent failed to substantially remedy the conditions that caused the children's removal.  That section reads, in part:

> (E)(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.
>
> * * *

{¶29} Appellant makes several arguments to support her claim that (E)(1) does not apply in this case including: (1) the trial court improperly considered Mother's past conduct relating to the closed case involving P.F., (2) the condition causing removal, domestic violence with Father, has been remedied because Father is incarcerated; (3) Mother's housing issues were 'ancillary' and are in the process of resolution; (4) Mother was employed and her income was increasing; and (5) Mother's mental health was improving.  We conclude that each of Mother's arguments are without merit.

---

[2] The court also referenced R.C. 2151.414(E)(10) and (E)(12), which apply solely to Father.

**{¶30}** First, Appellant claims the trial court improperly considered historical conduct regarding Mother's oldest child, P.F., whose case is closed. *In re Q.C.,* 2021-Ohio-3993, ¶ 20 (9th Dist.) (holding that the trial court erred in relying on evidence from prior, closed juvenile cases to support a finding that a parent failed to remedy the conditions causing removal in the current case, citing R.C. 2151.414(E)(1)), citing *In re B.C.*, 2015-Ohio-2720, ¶ 44 (4th Dist.) (trial court is prohibited from considering facts about case plan compliance in a prior, closed case); *In re Mark H.*, 1999 Ohio App. LEXIS 1923 (6th Dist.).

**{¶31}** However, the record reveals that P.F.'s removal was in August 2022, and a case plan was created for Mother and Father to attempt reunification and to provide continued support services to both parents. I.F. was born shortly thereafter, in April 2023. Mother's case plan was amended after I.F.'s birth, and again after N.F.'s birth, but the original case plan concerns and objectives were part and parcel of the subsequent amended ones regarding I.F. and N.F. In other words, the concerns stated in the respective case plans were ongoing from 2022 through the PC hearing in this matter. The trial court did not improperly consider Mother's "historical conduct," it simply stated the facts of the matter and provided context for I.F.'s removal as well as ongoing case plan requirements and objectives. This is not a case where Mother was free of the Agency's involvement for a significant amount of time, as Mother suggests. To the contrary, the Agency was involved with Mother from 2022 forward, without significant interruption. Thus, the trial court did not improperly consider her historical conduct.

**{¶32}** Second, Mother claims that the children were removed solely due to concerns related to domestic violence in the home. And, since the children's father was

incarcerated by the time of the permanent custody hearing, the problem has been remedied. However, the record clearly demonstrates that I.F. and N.F. were adjudicated dependent for multiple reasons, only one of which was domestic violence concerns. The respective decisions finding I.F. and N.F. dependent cite domestic violence, mental health issues for both parents, lack of housing, and financial instability. The case plan outlined several items for Mother - she was expected to engage in services to address <u>her</u> domestically violent behavior, engage in services to address her mental health concerns, acquire safe and stable housing, and maintain stable income/employment.

{¶33} Even assuming domestic violence was the Agency's "sole" concern, Mother seemingly cannot separate herself or her children from Father despite his violent behavior and significant mental health concerns. The evidence demonstrates Mother's pattern to resume contact with Father after each domestic violence incident. For example, despite initially agreeing to get a CPO against Father, within days of obtaining the order, she saw Father and then accused her therapist of pushing her into getting the CPO. *Tr.,* at pp. 108-109. Prior to the CPO, Mother refused to testify against Father in front of the grand jury for a separate incident of domestic violence. Mother refused to testify on two separate occasions and instead decided to marry Father. *Id.*, at p. 99. At the time of the hearing, Mother was even living with her father-in-law. The Agency is not confident that this issue has been resolved, or that such incidents will not continue to occur upon Father's release.

{¶34} Additionally, the record demonstrates the Agency had similar domestic violence concerns regarding Mother herself noting that Mother also screams, yells, pushes and hits. Mother's case plan required her to engage in services to address *her*

domestically violent behavior. Indeed, Caseworker Tracy testified it was hard to say whether Mother or Father was the "aggressor." *Tr.*, at pp. 112-13. Tracy stated, "I don't know if there's a primary aggressor. And the - - the reason I say that is because the story changes many times of who was the aggressor and who wasn't * * * They both admit to hitting on each other." *Id.* Thus, there is competent, credible evidence demonstrating the domestic violence concerns were not alleviated to the Agency's satisfaction and in accordance with the case plan objectives.

**{¶35}** Third, Mother claims that housing issues were simply ancillary to the domestic violence issues and were not a critical part of her case plan. To the contrary, the adjudicatory orders finding dependency and the case plans addressed the need for Mother to acquire and maintain stable housing for her and her children. The record demonstrates Mother has a pattern of unstable housing. In December of 2024, Mother and Father were evicted from their apartment. Subsequently, they were reported to be living in a motel in Buckeye Lake. After Father's most recent arrest, Mother began living with the paternal grandfather. That living arrangement was supposed to be temporary, for only two weeks, but turned into much longer, even up to the PC hearing. The arrangement was less than ideal. Aside from Mother stating the home did not have adequate space for the children, she also claimed she was concerned that paternal grandfather was "grooming" the other children in his home. *Tr.*, at p. 135.

**{¶36}** In March, five months before the hearing, Mother reported to Caseworker Tracy that she was getting an apartment at Washington Square, but then a week later told the Caseworker Tracy she was "just going to stay" with her father-in-law. Caseworker Tracy noted that Mother has often said she has a place but then the option would not

work out. More specifically, Mother claimed to have a housing option available to her in September (i.e. a month after the hearing), and Caseworker Tracy stated: "I don't know if that's real, not real. I don't have anything obviously from a landlord that says this is going to happen. It's not the first time that [Mother] has said that she's gotten a place."  Overall, the testimony demonstrates that Mother did not have stable housing for herself or the children.

{¶37}  Fourth, Mother claims her income was increasing and she was employed. However, as with other matters, Mother's income and employment history was up and down and she did not maintain employment that provided sufficient income for herself, let alone her children.[3]  Caseworker Tracy further testified that Mother cannot manage her finances, despite the Agency's efforts to assist her and prepare a budget, and Mother depends on others for many of her needs.  Caseworker Tracy stated that Mother has never been independent.  The testimony indicates both parents were repeatedly unwilling or unable to provide the Agency with consistent verification of their rent payments, receipts, or a budget. As such, Mother did not sufficiently remedy her financial instability.

{¶38}  Fifth and finally, Mother maintains her mental health was improving.  Mother suggests that the trial court's reliance upon "unresolved mental health concerns" was inappropriate because there was no expert testimony regarding a specific condition preventing reunification.  First, there was no objection to the testimony regarding Mother's mental health issues.  Second, a caseworker may give lay opinion testimony about a parent's mental health issues in a permanent custody case. *In re S.D.S.,* 2024-Ohio-255, ¶ 38 (8th Dist.); *see also, In re J.B.*, 2024-Ohio-680, ¶ 27 (2nd Dist.) ("While Mother

---

[3] Mother did not have a driver's license, so transportation was a secondary issue.

argues that there was no expert testimony demonstrating that she was incapable of properly caring for her children because of her mental health conditions, no expert testimony was required").

**{¶39}** Mother herself acknowledged needing counseling services and needing medication, but she was inconsistent in getting treatment. Mother admitted she had not been going to mental health counseling "as much as probably anybody wanted." *Tr.*, at pp. 32-33. Caseworker Tracy testified: "So we were asking for counseling services, because [Mother] has shared that she definitely has some depression and -- and some self-esteem issues." *Tr.*, at p. 103; 137. The GAL similarly testified: "I know Mom's made efforts to be honest and open with me about her past, and she * * * has suffered a lot of trauma on her own. That's why I think the mental health piece is so important, because if she can't deal with her own trauma I'm not sure how she's going to be able to manage kids, work, get them to day-care, all the things." *Tr.*, at p. 188.

**{¶40}** While Mother did attend counseling two times prior to the PC hearing, she did not consistently take advantage of the resources and recommendations provided to her by the Agency. The initial mental health services provider, Integrated Services, dropped services to the parents in October 2024 (presumably after Mother accused the therapist of forcing her to get the CPO against Father). Upon learning that Mother wanted to pursue another therapist, the Agency provided Mother with the names of multiple other providers and even took her to one facility. But Mother did not continue to pursue the options until just before the PC hearing. According to Caseworker Tracy, Mother lacked the necessary initiative to get into a new program. While Mother was undoubtedly under a lot of stress and had unresolved issues from childhood, the Agency tried to assist

Mother.  In fact, the transcript makes clear that the Agency cared about Mother and her progress.

**{¶41}** In the final analysis, the Agency's case plan identified areas of concern related to Mother's need to address her mental health issues, to secure stable employment and housing, to address continued concerns for domestic violence, demonstrate financial stability, and gain parenting skills to care for the children.  The Agency's efforts included making reasonable case plans and diligent efforts to assist the parents for several years. Caseworker Tracy repeatedly explained these objectives to Mother and provided recommendations to assist her. The Agency conducted home visits, attempted to locate kinship placements, and facilitated visitation between Mother and her children.  Despite these efforts, and although Mother tried at times, she failed to attain important and specific case plan objectives.  The trial court stated:

> Unfortunately, [Mother and Father] remain largely unchanged from the state
> and circumstances they were in when the children were removed from their
> care. Despite being provided resources by the Agency, [Mother and Father]
> have been unable to demonstrate that they can provide for their own needs,
> let alone the children's needs.
>
> *Trial Court's Decision*, p. 14.

**{¶42}** As an appellate court, we must neither weigh the evidence nor judge the credibility of the witnesses, our role is solely to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment.  *In re M.K.*, 2023-Ohio-3786, ¶ 26 (5th Dist.). After a thorough review of the record, we find that clear and convincing evidence exists to support the trial court's decision.  While

Mother made some minimal efforts to engage in the case plan after significant delays, she failed to substantially remedy the conditions that caused I.F. and N.F. to be removed in the first instance. It is evident that the trial court fully considered the factual issues and engaged in a rigorous analysis as required by Ohio law.

{¶43} Accordingly, the record clearly supports the trial court's finding pursuant to R.C. 2151.414(B)(1)(a) and corresponding R.C. 2151.414(E)(1). We need not address the court's findings pursuant to R.C. 2151.414(E)(4) or (E)(16), as applied to Mother. As set forth above, if the court makes even <u>one</u> finding under R.C. 2151.414(E)(1)-(15), the court shall determine the children cannot or should not be placed with the parent within a reasonable time.

{¶44} However, we briefly address the additional factors to ensure completeness. As set forth, the trial court found that under R.C. 2151.414(E)(4), the children cannot be placed with Mother or Father because they have demonstrated a lack of commitment towards the children by failing to regularly support, visit, or communicate with the children when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the children. Competent, credible evidence exists to support the trial court's findings.

{¶45} Mother demonstrated a lack of commitment in her failure to meaningfully engage with Agency services despite significant efforts by the Agency set forth throughout this Opinion. Mother did not properly rectify her own mental health issues and corresponding domestic violence tendencies, she did not follow through on finding stable housing, and she did not demonstrate financial independence or stability for herself or her children. In fact, with Father incarcerated, Mother was less stable financially.

Although Mother did participate in visitation with the children approximately 75% of the time, and was appropriate during those visits, this fact alone does not overcome her unwillingness regarding the additional more complex factors leading to the children's removal. Quite frankly, the visits were set up by the Agency, were supervised, and were the easiest part of the case plan. Mother simply did not demonstrate she could *properly* care for the basic or special needs of the children, now or in the foreseeable future. Thus, the children cannot be placed with Mother or should not be placed with her within a reasonable time. R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E)(4).

{¶46} Finally, the trial court relied upon the factor outlined in R.C. 2151.414(E)(16) which allows it to consider "[a]ny other factor the court considers relevant." Importantly, this factor does not have any requirement that a parent "failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home" like (E)(1), nor the "lack of commitment" or "unwillingness" elements found in (E)(4). The Court stated it was "extremely significant" that Mother was unable to be independent or provide for her own needs, without relying on assistance from others during the pendency of these matters, and that she has been unable to demonstrate progress on addressing violent behaviors in her and Father's relationship, as well as an inability to separate herself from Father. As set forth throughout this Opinion, significant evidence exists to support the trial court's findings. Accordingly, **Mother's first assignment of error is overruled in its entirety**.

### Best Interest under R.C. 2151.414(D)(1)

{¶47} Once the court makes the appropriate finding under R.C. 2151.414(B)(1), it must next determine whether PC is in the best interest of the child(ren) based on the

express statutory factors as well as any other relevant factor. As stated, the trial court determined that clear and convincing evidence exists that it is in the best interests of the children to grant PC to the Agency. Mother's second assignment of error argues the trial court erred in so finding. We disagree with Mother.

{¶48} Mother claims that although the trial court explicitly states it considered all the factors set forth in (B)(1), the record "reflects that the court placed dispositive weight on the children's foster placement and the passage of time while failing to meaningfully weigh Mother's relationship with the children, her ongoing progress toward reunification, and whether the children's need for a legally secure placement could be achieved without terminating her parental rights." *Appellant's Brief*, p. 14.

{¶49} The juvenile court has considerable discretion in weighing the requisite best interest factors and there is not one factor that is given more weight than the others. *M.K.*, at ¶ 33. Here, the testimony and record demonstrate that the children are bonded to their foster parents, are receiving more than adequate care, and are thriving in the home. The foster mother, Caseworker Tracy, and the GAL all agreed on this point. The foster parents are willing to adopt the children to provide them with permanent stability, while also acknowledging continued open communication with Mother, as appropriate. The children are too young to have verbally expressed their wishes. Regarding custodial history, it is clear the children have been in the Agency's custody, and physical placement with the same foster parents, for most of their very young lives. Indeed, I.F. was removed when he was about nine months old and N.F. was removed shortly after her birth. By the time of the hearing, I.F. and N.F. had spent a year-and-a-half and a year, respectively, in the custody of the foster parents.

**{¶50}** Finally, the trial court must examine the need for a legally secure and permanent home and whether such permanency can be accomplished without a grant of PC. To this end, Mother improperly suggests that this factor *requires* the trial court to grant her request for an extension of temporary custody. Mother appears to maintain that her status as Mother is paramount. Pursuant to R.C. 2151.415(D), the juvenile court may extend the temporary custody order of a child for a period of up to six months. *In re R.B.,* 2023-Ohio-2706, ¶ 46 (5th Dist.). This Court has held that the Agency must request the extension, such that there is no legal basis for Mother as parent to file for an extension of temporary custody. *In re A.R.,* 2023-Ohio-1359, ¶ 57 (5th Dist.) Here, importantly, the Agency did not request one.

**{¶51}** The trial court properly determined the children need a legally secure and permanent home and such permanency cannot be accomplished with Mother. The court stated: "[N.F. and I.F.'s] need for a legally secure permanent placement is immense as there are no viable relatives or kinship caregivers identified for placement. [Mother and Father] have been unable to establish that they can provide the children with a safe and stable environment." *Trial Court's Decision*, p. 20. The evidence in the record and described throughout this opinion clearly supports the trial court's findings. "[O]nce the trial court determines that one of the conditions under R.C. 2151.414(B)(1)(a) through (d) exists, the trial court must determine a permanent placement that is in the best interest of the children, regardless of the identity of the parties competing for custody." *In re B. W,* 2015-Ohio-2360, ¶ 31 (10th Dist.). That is exactly the arduous task undertaken by the trial court. In the final analysis, Mother's efforts to reunite with her children fell short despite the Agency's diligent efforts. Clear and convincing evidence exists to support the

trial court's determination that it is in the children's best interest to grant the Agency's motion for PC. **Mother's second assignment of error is overruled**.

## CONCLUSION

{¶52} Mother's first and second assignments of error are overruled, and the judgment of the Licking County Court of Common Pleas, Juvenile Division, is AFFIRMED.

{¶53} Costs to Appellant.

By: Montgomery, J.

Baldwin, P.J. and

Gormley, J. concur.